167 P.3d 336

**STATE of Hawai'i, Respondent/Plaintiff–Appellee**

**v.**

**Isaac K. MANEWA, Jr., Petitioner/Defendant–Appellant.**

**No. 27554.**

Supreme Court of Hawai'i.

Sept. 12, 2007.

Glenn D. Choy, for petitioner/defendant-appellant, on the application.

NAKAYAMA, ACOBA, and DUFFY, JJ.; with LEVINSON, J., Concurring Separately, and with whom MOON, C.J., joins.

Opinion of the Court by ACOBA, J.

Petitioner/Defendant–Appellant Isaac K. Manewa, Jr. (Petitioner) filed an application for writ of certiorari [1] (application) on March 19, 2007, requesting that this court review the judgment of the Intermediate Court of Appeals (the ICA) [2] filed on January 22, 2007, affirming the September 28, 2005 judgment of the first circuit court [3] (the court). Petitioner was charged in Count 8 of a February 19, 2004 indictment with Promoting a Dangerous Drug in the First Degree, HRS § 712–1241(1)(b)(ii)(A) (Supp.2003) [4]; in Count 9 with Promoting a Dangerous Drug in the Second Degree, HRS § 712–1242(1)(b)(i) (1993 & Supp.2003) [5]; and in Count 10 with Unlawful Use of Drug Paraphernalia, HRS § 329–43.5(a) (1993). He was convicted under Counts 8 and 9 and was sentenced to a term of imprisonment of twenty (20) years with a mandatory minimum of one (1) year for Count 8; and a term of imprisonment for ten (10) years with a mandatory minimum six months for Count 9.

We hold that the evidence was insufficient to establish the weight of the dangerous drugs required to be proved beyond a reasonable doubt under the charges. Accordingly, the January 22, 2007 ICA judgment is reversed, the court's September 28, 2005 judgment is vacated, and the case is remanded for disposition in accordance with this opinion.

## I.

### A.

The facts following were taken from the application and the briefs.

On January 26, 29, [and] February 11, 2004, police officer Ray Gabur, working under cover, bought methamphetamine ... from a female, and arranged with her for another buy on February 13, 2004. On February 13, 2004, *[Petitioner], acting in the female's [place], handed Gabur two packets containing a crystalline substance, in exchange for $600.* [Petitioner] was

1. Pursuant to Hawai'i Revised Statutes (HRS) § 602–59 (Supp.2006), a party may appeal the decision of the intermediate appellate court (the ICA) only by an application to this court for a writ of certiorari. *See* HRS § 602–59(a). In determining whether to accept or reject the application for writ of certiorari, this court reviews the ICA decision for:

 (1) Grave errors of law or of fact; or
 (2) Obvious inconsistencies in the decision of the [ICA] with that of the supreme court, federal decisions, or its own decision,

 and the magnitude of such errors or inconsistencies dictating the need for further appeal. HRS § 602–59(b). The grant or denial of a petition for certiorari is discretionary with this court. *See* HRS § 602–59(a).

2. The SDO was issued by then-Chief Judge James S. Burns and Associate Judges Corinne K.A. Watanabe and Daniel R. Foley.

3. The Honorable Richard K. Perkins presided.

4. HRS § 712–1241 (Supp.2003) stated, in relevant part, as follows:

 **Promoting a dangerous drug in the first degree.** (1) A person commits the offense of promoting a dangerous drug in the first degree if the person knowingly:

 . . . .

 (b) Distributes:

 . . . .

 (ii) One or more preparations, compounds, mixtures, or substances of an aggregate weight of:

 (A) *One-eighth ounce or more*, containing methamphetamine, heroin, morphine, or cocaine or any of their respective salts, isomers, and salts of isomers[.]

 (Emphasis added.)

5. HRS § 712–1242 provides in pertinent part:

 **Promoting a dangerous drug in the second degree.** (1) A person commits the offense of promoting a dangerous drug in the second degree if the person knowingly:

 . . . .

 (b) Possesses one or more preparations, compounds, mixtures, or substances of an aggregate weight of:

 (i) *One-eighth ounce or more*, containing methamphetamine, heroin, morphine, or cocaine or any of their respective salts, isomers, and salts or isomers[.]

 (Emphasis added.)

subsequently taken into custody[.] [Following a search, Petitioner was found to have] $790 in currency, a scale, lighter, and a cellular phone, [which were] seized from his person.

On February 15, 2004, pursuant to warrant, police searched a black fanny pack that [Petitioner] had been seen wearing which was found in the bed of a pick up truck [that was located at the scene of the alleged incident]. *[The fanny pack was found to] contain[] paraphernalia and three ziplock bags containing a crystalline substance[.]*

[Honolulu Police Department criminalist,] Hassan Mohammed [ (Mohammed) ], examined, analyzed, and reported on the [aforementioned] drug evidence. [Mohammed] was "attached to the drug analysis unit at the Honolulu Police Department" for over ten years. As a criminalist with the Honolulu Police Department, [Mohammed's] duties consisted of the analysis and identification of controlled substances. *[At trial, Respondent offered Mohammed] as an expert in the field of drug analysis and identification.* ... [While under direct examination,] *Mohammed maintained that he "routinely weigh[s] every piece of evidence that comes in" as part of his responsibility in analyzing and identifying illegal drugs.*

(Emphases added.)

During direct examination Mohammed testified to the procedure for weighing of the crystalline substances recovered.

Q. [PROSECUTOR] Okay. Do you use any particular instrument during the regular course of business to determine the weight of these substances?

A. [MOHAMMED] *Yes, sir, we use an analytical balance.*

Q. Are you familiar with the analytical balance?

A. Yes.

Q. How long have you been using this balance?

A. Twenty-five to [thirty] years.

Q. Are you familiar with its operation?

A. Yes.

Q. Do you know how it functions?

A. *Precisely its mechanisms I wouldn't know, but I know I've been trained on how to use it and to operate it.*

Q. Is it fair to say then that this balance is a piece of equipment that's used during the regular course of business in your field of expertise?

A. That's correct.

Q. *Are you familiar, if you know, whether or not any procedures or there's any protocol to determine whether or not your balance is operating properly?*

A. Yes, sir.

Q. Will you please briefly explain to the jurors what this process is.

A. *We have a manufacturer representative who checks out and services the balance two times a year, and I have my own personal balance which I verify and validate once a month and we so record it.*

Q. So the balance ... so that we are clear, you check your balance once a month?

A. That's correct.

Q. *Do you ever check the balance before each ... individual test that you perform during the normal course of business?*

A. *No, sir.*

Q. Is there anything based on your experience with this balance, 30 years of experience, that could indicate to you whether or not the balance is not working properly?

A. No, I have not come across that even once.

. . . .

Q. *Now, on this day did you use that analytical balance that you described earlier?*

A. *Yes, I did.*

Q. To your knowledge was the balance working properly?

A. Yes, sir.

Q. *And what was the net weight of the substance that was extracted from that glass pipe you described?*

[DEFENSE COUNSEL]: *Objection, Judge. There's a lack of foundation for the scientific evidence.*

[PROSECUTOR] 703

[THE COURT] Overruled

. . . .

Q. What was the result of the confirmation test?

[DEFENSE COUNSEL]: Again, Judge, objection. Lack of foundation for scientific evidence.

[THE COURT]: Overruled.

. . . .

Q. What was the net weight of State's Exhibit No. 2?

[DEFENSE COUNSEL]: Objection, Judge. Lack of foundation for scientific evidence.

[THE COURT]: [Defense Counsel], are you going to make the same objection on all of the opinions as to weight and as to the nature of the substance?

[DEFENSE COUNSEL]: Yes, Judge.

[THE COURT]: *Then I will give you an objection to all of those opinions.*

[DEFENSE COUNSEL]: *So a running objection?*

[THE COURT]: *Yes.*

(Emphases added.)

During direct examination Mohammed also testified to the procedure for identifying the crystalline substances seized.

Q. [PROSECUTOR] Okay. Now as a criminalist whose duties are dedicated to drug analysis and identification, do you have any experience testing substances for the presence of methamphetamine?

A. [MOHAMMED] Yes, I have.

Q. As a criminalist, are there any particular tests that you routinely perform to make this determination for the presence of methamphetamine?

A. Yes, sir.

Q. What test or tests do you routinely perform?

A. We have a couple of routine presumptive tests and then there's a couple of confirmation tests that we routinely perform.

Q. If you could name—let's go through the test—

A. Yes.

Q.—name those and summarize briefly what this test involves.

A. Specifically for methamphetamine?

Q. For methamphetamine.

A. One would be a color test. . . .

. . . .

Q. Okay, go ahead.

A. That's one presumptive test. Another presumptive test that we can use for methamphetamine is a microcrystalline test where we subject a small portion of the evidence to another reagent, chloride phosphoric acid, and observe the development of microcrystalline under the microscope and characteristically if methamphetamine is present I would get a clothespin-shaped crystal structure which did indicate or confirm the presence of methamphetamine. Those are two presumptive tests.

Q. Presumptive tests, okay. Is there any other tests, a confirmatory test?

A. Yes. Once the presumptive test gives an indication of what the drug would be, then *I proceed to confirm it with one of two confirmation tests. I use an infrared instrument called the Fourier Transform Infrared Spectrometer, in short FTIR, or I use the gas chromatograph mass spectrometer [ (GCMS) ]to confirm the definitive identified presence of methamphetamine*—presence or absence of methamphetamine.

Q. As to the presumptive test, is the color reagent test a test that you commonly use during your normal course of duties as a criminalist?

A. Yes, sir.

Q. And is this a test based on your at least ten years of experience at HPD that you rely on?

A. Yes, sir.

Q. Now, the other presumptive test was another reagent test; is that correct?

A. Microcrystalline test.

Q. I'm sorry, microcrystalline test. Is this test recognized in your field of exper-

tise as—I'm sorry, recognized to determine the presumptive presence of methamphetamine?

A. Yes, sir.

Q. And is this a test that you regularly perform during the normal course of your duties?

A. Yes, I do.

Q. Do you rely on this test?

A. Yes.

Q. Same questions as to the confirmatory test. As to the FTIR—we will use that acronym because I couldn't possibly remember the Fourier Transform, et cetera.

Is the FTIR test a test that's recognized in your field of expertise as a test that's commonly used to confirm the presence of methamphetamine?

A. Yes, it is.

Q. Is this a test that you commonly rely upon?

A. Yes, I do.

Q. And as to [GCMS], is that similarly a test that's recognized in your field of expertise as acknowledged to confirm the presence of methamphetamine?

A. Yes, it is.

Q. And do you rely on the results of this test during the normal course of business?

A. Yes, I do.

Q. And so that we are absolutely clear, have you been trained and do you have professional experience in the administration of each of these four tests?

A. Yes, I have.

(Emphasis added.)

The following was adduced during defense counsel's cross-examination with respect to the machines:

Q. [DEFENSE COUNSEL] Mr. Mohammed, *the analytic balance you mentioned, is that an electronic instrument?*

A. [MOHAMMED] *Yes, it is.*

Q. *Also, the FTIR, that's electronic also; right?*

A. *Yes.*

Q. *And also the GCMS?*

A. *Yes, sir.*

Q. In other words, you've got to take an electric plug and plug it into the AC in the wall?

A. It's permanently plugged.

Q. Into an electronic source?

A. Electrical source.

Q. So all these machines, analytic balance, the FTIR and the GCMS, they are electronic as opposed to mechanical; correct?

A. *There may be mechanical components within the analytical balance but essentially electronic balances. FTIR, electronic, and GCMS, as you said, are also electronic.*

Q. And as you testified, all your training basically is as a chemist; correct?

A. Yes, I have been a chemist all my life. Working life.

Q. *Okay. And you've never worked at calibrating these instruments?*

A. *No.*

Q. *So basically you can operate these machines, correct, but you cannot maintain it; correct?*

A. *I wouldn't be able to service them* but I do—I have been trained to ensure that the GCMS and FTIR are in working condition.

Q. *So that you can ensure that you can use them; correct?*

A. *That it's in proper working condition for my purpose.*

Q. Proper working condition, you can start it up, take readouts from it; correct?

A. Yes. *We have a routine procedure for the GCMS, if I may explain. Each and every morning before any chemist uses one of several GCMSs, we do a routine check on them to ensure that all the parameters are within the manufacturer specification.*

Q. *Okay.*

A. *And we record those as such and if it is not, we don't use it.*

Q. *I'm sorry, if it is not?*

A. *If it is not, if any parameter is out of spec, we do not use it until it's rectified.*

Q. But, let me see, you did testify that the manufacturer sends representatives to do the actual calibration; correct?

A. The actual servicing and the calibration two times a year, yes, sir.

Q. Okay. Now the analytic balance that you mentioned—

A. Yes.

Q.—was it the same particular balance that you used to analyze the State's Exhibits 2 through 7, same analytic balance?

A. Yes, sir. I have my individual analytic balance.

Q. And on all of these exhibits, 2 through 7, you used the GCMS; is that correct?

A. If I may refer to my notes?

Q. Certainly.

A. *I believe I used the FTIR on one, sir. I used the GCMS on each one of them except for the residue from the pipe, in which case I did use the FTIR on that one.* I used the GCMS, that will be correct.

Q. Now, is it the same—let's talk about the GCMS.

Is it the same GCMS machine that was used on all items you've talked about?

A. May I reference my notes?

Q. Sure.

A. *I used two GCMSs.*

Q. *And just one FTIR; correct?*

A. *That's correct.*

Q. Okay. Now, you mentioned that the manufacturers, they send reps two times a year to service or calibrate all—

A. On the analytic balance, yes.

Q. *How about the GCMS?*

A. *I believe they come in if not twice, at least once a year.*

Q. *Again, that's to service and calibrate?*

A. *That's correct.*

Q. How about the FTIR, how often do the manufacturers send the reps?

A. If not twice, at least once a year.

Q. Okay. And that's, again, to service and calibrate; correct?

A. That's correct.

Q. Okay. So as far as you know, the calibration and servicing was done, correct?

A. Yes, sir.

Q. *But you, yourself, you don't have the personal knowledge of the calibration and the servicing; correct?*

A. Once he is finished calibrating it then he fills out a form and indicates that it was in proper working condition prior to his testing and found it working after the servicing, too. The first thing he does is to make sure that it was in working condition when he arrives.

Q. *And he fills out a form for all three, analytical balance, GCMS, FTIR?*

A. *That's correct,* all the instruments at the laboratory.

Q. *But you don't have the forms with you now; right?*

A. I haven't brought it, but it's available.

Q. But you don't have them now?

A. *No, I was not required to bring them.*

(Emphases added.)

### B.

Following the end of the case, Petitioner "move[d] for a judgment of acquittal." Petitioner asserted that "[t]he testimony from the chemist, Mohammed, was incompetent evidence under the case *State v. Wallace* [, 80 Hawai'i 382, 910 P.2d 695 (1996)]." The court responded that "the motion's denied."

### II.

In his application, Petitioner poses four issues: (1) "whether the [c]ourt abused its discretion in allowing [Respondent's] chemist to opine on the weight and identity of the State's drug evidence"; (2) "whether the [c]ourt abused its discretion in failing to exclude [Respondent's] chemist's testimony pursuant to Hawai'i Rules of Evidence [(HRE)], Rule 702"[6]; (3) "whether the

---

**6.** HRE Rule 702 (1993) entitled "Testimony of experts," states as follows:

[c]ourt abused its discretion in relying on [HRE] Rule 703[7] in admitting [Respondent's] chemist's testimony"; and (4) "whether the [c]ourt abused its discretion in failing to exclude [Respondent's] chemist's testimony pursuant to [HRE] Rule 403."[8] In effect, an affirmative answer to the first issue subsumes the remaining three issues.

## III.

The ICA affirmed the September 28, 2005 judgment. As to the first issue, the ICA contended in pertinent part:

A "foundational prerequisite for the reliability of a test result is a showing that the measuring instrument is in proper working order." [*Wallace*, 80 Hawai'i at 407, 910 P.2d at 720] (internal quotation marks and citation omitted). "Therefore, a proper foundation for the introduction of a scientific test result would necessarily include expert testimony regarding: (1) the qualifications of the expert; (2) whether the expert employed valid techniques to obtain the test result; and (3) whether the measuring instrument is in proper working order." *State v. Long*, 98 Hawai'i 348, 355, 48 P.3d 595, 602 (2002) (internal quotation marks and citation omitted).

The parties here agree that Mohammed was properly qualified as an expert witness. . . . [Petitioner] argues that [Respondent] failed to satisfy the second prong under *Long* because Mohammed did not aver that the presumptive color reagent test was recognized in his field. [Petitioner], however, directs this court to no portion of the record where he objected to this alleged failure, and thus the point is deemed waived. HRE Rule 103.

. . . [As to the second ground, *Petitioner] argues that Mohammed had no personal knowledge that the instruments he used were properly calibrated and/or serviced. [Petitioner] contends that Mohammed admitted the instruments were electronic and he had never himself calibrated them and instead relied upon the semi-annual calibrations performed by the manufacturer's representative. [Petitioner] asserts that Mohammed did not supply the logs completed by the manufacturer's representative and thus his testimony that the equipment was calibrated properly amounts to inadmissible hearsay. However, Mohammed testified that he had personal knowledge that the balance was serviced semi-annually. In Wallace*, the testifying expert lacked personal knowledge that his scale had been properly calibrated, merely relied on the assumption that the manufacturer's representative had done so, and failed to supply

---

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise. In determining the issue of assistance to the trier of fact, the court may consider the trustworthiness and validity of the scientific technique or mode of analysis employed by the proffered expert.
Petitioner maintains that "Mohammed, a chemist qualified as an expert in the analysis and identification of substances, was not by his own admission trained to calibrate, maintain or [service] the FTIR, GCMS, and balance scale."

7. HRE Rule 703 (1993) regarding "[b]ases of opinion testimony by experts," states that:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need

not be admissible in evidence. The court may, however, disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.
Petitioner maintains that "Rule 703, regarding the basis of opinion testimony by an expert witness, only applies once an expert has been properly qualified to testify as an expert. Mohammed was not qualified to testify as an expert as to the maintenance, servicing and/or calibration of the instruments he used."

8. HRE Rule 403 (1993) states as follows:

**Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time.** Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.
Petitioner maintains that Mohammed was not qualified to testify as to the proper calibration of the instruments, thus, the court and the ICA erred for "failing to exclude Mohammed's testimony as irrelevant."

the service records; in that failure, the Hawai'i Supreme Court found error. *Wallace*, 80 Hawai'i at 412, 910 P.2d at 725. While *[Respondent] did not produce the maintenance records for the balance in question, [Respondent] did offer an independent source of reliable evidence that the balance was working properly. Mohammed, [Respondent's] expert, testified on direct examination that he personally verified and validated the balance monthly, in addition to the semi-annual service by the manufacturer's representative. Mohammed's testimony that he himself verified and validated his balance therefore satisfies the third prong of the Long test.*

SDO at 5–7 (Emphases added.) In his application, Petitioner observes that:

Applying *Wallace*, the ICA noted that [Respondent] did not produce any maintenance records, but reasoned that this was not necessary as [Respondent] had offered an independent source of reliable evidence. SDO at 6–7. *This source was Mohammed, an expert, testifying that he personally verified and validated the balance each month in addition to its semi-annual servicing.* SDO at 7. This testimony, the ICA held, satisfied the proper working order test. *Id.* ... The ICA held that this testimony was not hearsay as it was based on Mohammed's own personal knowledge that the equipment had been verified and, thus, was working properly. SDO at 7–8.

(Emphasis added.) In challenging the SDO, Petitioner contends the ICA erred as follows:

The ICA's application of *Wallace* ... fails for five reasons. *One, the ICA failed to reject, pursuant to the dictates of Wallace, Mohammed's implicit assumption that the manufacturer's representative was qualified to maintain, service and calibrate the machine. Two, Mohammed himself was not qualified as an expert in the maintenance, servicing and/or calibration of the machines.* Thus, his testimony to the effect that the machines were in proper working order was incompetent because it exceeded the scope of his expert knowledge. *Three, Mohammed assumed, without having the expertise to know, that*

*the semi-annual servicing of the machines was done competently. Four, Mohammed did not explicitly specify who trained him, nor how he was trained, in the daily validation and verification he engaged in. Lastly, because Mohammed could not competently testify as to the proper working order of the machines, [Respondent] was required to produce non-hearsay, competent evidence as to the machines' calibration* from a proper source; i.e., the manufacturer's representative and/or records.

(Emphases added.)

Respondent did not file a response to the application.

## IV.

In its answering brief, Respondent maintained that (1) "[t]he application of *[State v. Schofill*, 63 Haw. 77, 81, 621 P.2d 364, 368 (1980),] to the charge of distributing methamphetamine as set forth in Count VIII[,] reveals that [Respondent] could prove the identity and weight of the methamphetamine *without [Mohammed's] testimony regarding the results of his analysis*" (emphasis added), inasmuch as (a) "[i]n order to prove the identity and weight of the methamphetamine, [Respondent] needed to adduce evidence that demonstrated beyond a reasonable doubt the existence of an offer to sell one-eighth ounce or more of methamphetamine; which would 'necessarily require proof of the ... intention to perform' such a transaction," *Schofill*, 63 Haw. at 83, 621 P.2d at 369, which was proven because (i) "[t]he intent to perform the sale of the 'two 8 balls' of methamphetamine was demonstrated unequivocally," (ii) "[Petitioner's] willing participation and complicity in the sale of the methamphetamine is further revealed by his own testimony," (iii) "[Petitioner] had heard the term 'crystal methamphetamine' and the slang term 'ice'... he knew 'what ice look[ed] like,' it was a dangerous drug and illegal to possess or sell," and (iv) "[Petitioner's] criminal liability arises from his complicity in the sale"; (2) unlike the situation in *Wallace*, there was evidence from which the trial court could conclude that the instruments [Mohammed] used to determine methamphetamine was

present ... were "in proper working order," inasmuch as (a) "the deputy prosecutor elicited testimony that demonstrated [Mohammed's] expertise in the analysis and identification of illegal drugs"[9] and (b) "[t]he testimony the deputy prosecutor elicited from [Mohammed] also demonstrated that the instruments he used were in proper working order and the results were reliable and indicated the presence of methamphetamine in and the respective weight of each of prosecution exhibits 2, 3, 4, 5, and 6[,]" inasmuch as (i) *"Mohammed testified as an 'expert in the field of drug analysis and identification' and 'any opinion that [he] offer[ed] ... would be to a reasonable degree of scientific certainty based on [his] field of expertise,'"* (A) "Mohammed testified that he used an 'analytical balance' to weigh prosecution exhibits 2 and 3 ..., and 4, 5, and 6," (B) *"Mohammed had been 'trained ... to use and ... to operate' the analytical balance and had worked with the instrument for '[t]wenty-five to thirty years,'"* (C) *"Mohammed also indicated that the 'balance [was] a piece of equipment that's used during the regular course of business in [his] field,'"* (D) *"Mohammed also testified that he 'would not have used any of the instruments if they were not in proper working condition [on] that particular day,'"* (ii) "unlike the situation in *Wallace* ... Mohammed's testimony demonstrated that he weighed the purported methamphetamine in a manner that was consistent with his uncontested status as an established 'expert in the field of drug analysis and identification,'" and (iii) *"Mohammed's testimony demonstrated that he took the steps necessary to ensure that his personal analytical balance was in proper working order, thereby rendering results upon which he could offer an opinion ... to a reasonable degree of scientific certainty based on [his] filed of expertise."* (Internal quotation marks omitted.)

For these reasons, Respondent requested that Defendant's convictions and sentence be affirmed.

## V.

In his reply brief, Petitioner argued (1) "[Respondent] did not prove all material elements of promoting a dangerous drug in the second degree (i.e., possession of one-eighth ounce or more of methamphetamine) beyond a reasonable doubt," inasmuch as (a) "[t]here was [not] sufficient evidence to convict defendant," (b) "[Respondent did not] introduce sufficient evidence concerning the weight of the substances [Petitioner] was alleged to have possessed," (c) "[Petitioner's] objection raised the issue of the lack of proper foundation for admitting evidence as to the weight of the substances in question," (d) *"[Respondent] did not establish a sufficient foundation to admit the chemist's testimony as to the aggregate weight of the substances defendant was alleged to have possessed,"* and (e) "[*Wallace* does apply] to the facts of [Petitioner's] case," and (2) "[Respondent] did not prove all material elements of promoting dangerous drug first degree (i.e., distributing of one-eighth ounce or more of methamphetamine) beyond a reasonable doubt." Petitioner "respectfully requests that this [c]ourt vacate his conviction and remand this matter for further proceedings." (Emphasis added.)

## VI.

Respondent's citation to *Schofill* is irrelevant as that case is plainly distinguishable from the case at hand. In *Schofill*, the question pertinent to the instant case was whether "incompetent and prejudicial evidence was presented by the State *to the grand jury*[.]" 63 Haw. at 78, 621 P.2d at 366 (emphasis added). An undercover police officer had established several contacts with both the

---

9. Respondent argues as to Mohammed, that (1) "he had an undergraduate and 'master's' degrees in 'applied chemistry,'" (2) "he had been 'attached to the drug analysis unit at the Honolulu Police Department' for over ten years," (3) "he had 'completed a nine-month full-time training at the department, followed by extensive training with the Drug Enforcement Agency in Washington, then with the California Criminalist Institute and with the McCrone Research Center,'" (4) "during his employment with the police department he had 'attended numerous workshops and seminars,'" (5) "as part of his 'ongoing professional education' he attends at a 'minimum one [workshop or seminar] a year,'" (6) "he belonged to 'The American Academy of Forensic Sciences,'" and (7) "he had been qualified to testify as an expert in 'the examination and analysis of controlled substances' in the courts of Hawai'i '[o]ver 50 times.'"

defendant (Schofill) and an intermediary (Thornton) who both had, on numerous occasions, promised to deliver cocaine to the undercover police officer. When the promised amount of cocaine was not delivered to the undercover officer, "he asked for his money back." *Id.* at 80, 621 P.2d at 367.

As this court noted, "[n]o actual purchase was ever consummated with the defendant." *Id.* Schofill was "indicted for knowingly distributing proscribed drugs under HRS [§ ] 712–1241 (1976 & Supp.1979)[.]" *Id.* at 81, 621 P.2d at 368. It was observed that "[a] person 'distributes' ... where, with the specific intent to sell, the accused has offered to sell the contraband." *Id.* (citations omitted). The undercover officer was the only witness before the grand jury and testified in pertinent part:

A. *They appeared to be cocaine from past experiences* where I've purchased cocaine and it has been tested in a laboratory with positive results. It looked similar to that substance.

Q. In addition to this working knowledge of the drugs, *have you also received training in the identification?*

A. *Several college courses dealt with drugs and cocaine.*

(THE PROSECUTOR): Are there any questions?

(GRAND JURY FOREMAN): *Those four packets were tested,* did you say?

A. *No, sir, they were returned.*

*Id.* at 80, 621 P.2d at 368 (emphases added). With respect to proof at the grand jury that the white substance was cocaine, this court said the officer's expertise need not be such as to qualify him as an expert "at trial" to "render an opinion" as to whether "the substance was in fact cocaine."

The substance *was represented to him as cocaine,* and because of his training and experience the officer was able to testify that it appeared to him to be cocaine. His *background concerning narcotics identification might have been more fully developed* by the prosecution. *However, evidence before the grand jury, where the standard is essentially that of probable cause, need not be as detailed as at trial.*

*Moreover, the officer's expertise need not be such as to qualify him to render an opinion that the substance was in fact cocaine.*

*Id.* at 83, 621 P.2d at 369 (emphases added). Accordingly, this court held the officer "was qualified to state that the substance 'appeared to be cocaine' " and "[t]he challenged testimony was neither incompetent nor prejudicial[.]" *Id.* at 83, 621 P.2d at 370. As distinguished from *Schofill,* the proceeding here was not at the grand jury, but at trial, and in the trial proceeding it was required that Mohammed be qualified as an expert in the identification and weighing of methamphetamine.

## VII.

As it relates to Petitioner's first issue, in *Wallace,* this court concluded that the accuracy of an electric balance was not satisfied. There, Donald Chinn (Chinn), a forensic chemist and qualified expert, testified regarding the net weight of cocaine found in the defendant's car. *Wallace,* 80 Hawai'i at 412, 910 P.2d at 725. This court noted that although Chinn "had personal knowledge that the electronic balance was calibrated annually[,]" he "lacked personal knowledge that the balance had been correctly calibrated and merely assumed that the manufacturer's service representative had done so." *Id.* However, "[t]he service representative did not testify at trial regarding his calibration of the balance[.]" *Id.* And further, "the prosecution, through a custodian of records, [did not] offer any business record of the manufacturer reflecting proper calibration of the balance." *Id.*

Based on the above, *Wallace* held that "[t]here being no reliable evidence showing that the balance was 'in proper working order,' the prosecution failed to lay 'a sound factual foundation' that the net weight of the cocaine measured by the balance was accurate." *Id.* (internal citations omitted). It was concluded that "because inadequate foundation was laid to show that the weight measured by the balance could 'be relied on as a substantive fact,' [the forensic chemists'] assumption that the balance was accurate was based on inadmissible hearsay." *Id.* (in-

ternal citations omitted). The preceding analysis can be applied to the case at hand.

## VIII.

 Mohammed was qualified as an expert in drug analysis and identification.[10] According to Petitioner's application for certiorari, Mohammed used the GCMS to identify the crystalline substances recovered as methamphetamine. Mohammed testified that "a routine check" was done of the GCMS "each and every morning" "to ensure that all the parameters are within manufacturer specifications." Mohammed related "if any parameter is out of spec, we do not use it until it is rectified." Thus, the record indicates that there was an established manufacturer's procedure that could be conducted by the user to ensure that the GCMSs were in working order according to the manufacturer's specifications.

Because the evidence indicated the GCMSs were operating "within the manufacturer specification(s)," under this procedure Mohammed's own testimony supported the conclusion that the GCMSs were in proper working order at the time the evidence was tested. *Wallace,* 80 Hawai'i at 407, 910 P.2d at 720. Therefore, Mohammed's assertion on cross-examination that "I do have personal knowledge because I would not have used any of the instruments if they were not in proper working condition in that particular days," [sic] is consistent with the "personal knowledge" necessary to establish that the *GCMSs* were in proper working condition. Based on the foregoing analysis, a proper foundation for the identity of the crystalline substances was laid. Consequently, the

court did not abuse its discretion in allowing Mohammed to testify as to the identity of the crystalline substances.

## IX.

However, as to the reliability of the analytic balance, the ICA distinguishes *Wallace* on the ground the expert in that case "relied on the assumption that the manufacturer's representative" "had ... properly calibrated" his scale, whereas "Mohammed ... testified ... he personally verified and validated the balance monthly," "satisfy[ing]" that "the balance was working properly." SDO at 7 (citing *Wallace,* 80 Hawai'i at 412, 910 P.2d at 725). However, the evidence failed to establish (1) that Mohammed had any training or expertise in calibrating the balance, (2) that the balance had been properly calibrated by the manufacturer's service representatives, (3) that there was an accepted manufacturer's established procedure for "verify[ing] and validat[ing]" that the balance was in proper working order and that if such a procedure existed, that Mohammed followed it, and (4) that his balance was in proper working order at the time the evidence was weighed. Accordingly, as to the balance and the related weighing of the methamphetamine, it appears the ICA gravely erred.

## X.

### A.

 Mohammed was not qualified as an expert in the calibration of the analytical balance. Mohammed used the balance to weigh the evidence although he did not know how its mechanism functioned.[11] The bal-

---

10. At trial, the following transpired:
 [PROSECUTOR]: At this time the State offers Mr. Mohammed as an expert *in the field of drug analysis and identification,* subject to any voir dire examination.
 THE COURT: [Defense counsel].
 [DEFENSE COUNSEL]: No objection, Judge.
 THE COURT: He may testify.
 (Emphasis added.)

11. Mohammed testified as follows on direct examination:
 Q. Okay. Do you use any particular instrument during the regular course of business to determine the weight of these substances?

A. Yes, sir, we use an analytical balance.
 Q. Are you familiar with this analytical balance?
 A. Yes.
 Q. How long have you been using this balance?
 A. Twenty-five to [thirty] years.
 Q. Are you familiar with its operation?
 A. Yes.
 Q. Do you know how it functions?
 A. *Precisely its mechanism I wouldn't know,* but I know I've been trained how to use it and to operate it.

ance is an electronic instrument.[12] Mohammed himself did not know how to calibrate the balance or how to service it. He indicated that he had never calibrated the balance and that he would not be able to service the machines, although, as noted before, he had been trained to ensure that the GCMS and FTIR instruments were in working order.

Q [DEFENSE COUNSEL]. Okay. *And you've never worked at calibrating these instruments?*

A. *No.*

Q. So basically you can operate these machines, correct, but you cannot maintain it [sic]; correct?

A. *I wouldn't be able to service them* but ... I have been trained to ensure that the GCMS and FTIR are in working condition.

(Emphases added.) Further, on cross examination, defense counsel asked Mohammed, "[Y]ou cannot testify to the proper servicing of all three instruments because you, yourself, personally didn't do the servicing; correct?" Mohammed answered, "That would be correct. I wouldn't be able to testify to the servicing of the instruments."

### B.

#### 1.

Like forensic chemist Chinn in *Wallace,* Mohammed "had personal knowledge that the electronic balance was calibrated [semi-]annually." 80 Hawai'i at 412, 910 P.2d at 725. However, as in *Wallace,* there was no evidence that Mohammed had personal knowledge that the balance had been correctly calibrated. Defense counsel addressed this issue during cross examination:

Q. [DEFENSE COUNSEL]: Okay. So as far as you know, the calibration and servicing was done, correct?

A. [MOHAMMED]: Yes, sir

(Emphasis added.) For convenience, parts of the transcript previously quoted are reiterated in the discussion *infra.*

12. The following was adduced on cross-examination:

Q. *But you, yourself, you don't have the personal knowledge of the calibration and the ... servicing: correct?*

A. Once he is finished calibrating it then he fills out a form and indicates that it was in proper working condition prior to his testing and found it working after the servicing, too. The first thing he does is to make sure that it was in working condition when he arrives.

. . . .

Q. And he fills out a form for all three, analytic balance, GCMS, FTIR?

A. That's correct . . . .

Q. But you don't have the forms with you now; right?

A. I haven't brought it, but it's available.

Q. But you don't have them now?

A. *No, I was not required to bring them.*

Q. *So whatever information as to the proper servicing or proper calibration, that's contained on these forms; correct?*

A. That's correct.

Q. Which you don't have right now; correct?

A. That's correct.

(Emphases added.) Based on these statements by Mohammed, he "lacked the personal knowledge that the balance had been correctly calibrated and merely assumed that the manufacturer's service representative had done so." *Wallace,* 80 Hawai'i at 412, 910 P.2d at 725.

#### 2.

Again, as in *Wallace,* Respondent did not call the manufacturer's service representative to testify to calibration of the balance. *Id.* Moreover, as in *Wallace,* Respondent did not offer any business records of the manufacturer indicating a correct calibration of the balance. This court in *Wallace* noted, that "Wallace concedes in his brief that '[a]

Q. Mr. Mohammed, the analytic balance you mentioned, is that an electronic instrument?

A. Yes, it is.

document provided by the calibrating agency showing the name of the person calibrating the [balance], that he was qualified, [and] that [the balance] was calibrated on a certain date may well have fallen under the hearsay exception[s relating to] business records, but this was not [offered into evidence.]' " *Id.* at 412 n. 28, 910 P.2d at 725 n. 28 (some brackets in original and some added). Although available per the testimony of Mohammed, Respondent did not offer such records into evidence. Accordingly, as in *Wallace,* Respondent failed to offer "through a custodian of records, ... any business record of the manufacturer reflecting proper calibration of the balance." *Id.* at 412, 910 P.2d at 725 (citation omitted).

### 3.

Given the foregoing, an "inadequate foundation was laid to show that the weight measured by the balance could 'be relied on as a substantive fact,' [Mohammed's] assumption that the balance was accurate was based on inadmissible hearsay." *Id.* (citations omitted).

### XI.

Respondent and the ICA apparently rely on Mohammed's assertion that "[w]e have a manufacturer representative who checks out and services the balance two times a year, and *I have my own personal balance which I verify and validate once a month and we so record it*[,]" (emphasis added), as distinguishing this case from *Wallace.* The ICA placed emphasis on the fact that "Mohammed ...

testified that he personally verified and validated the balance monthly." SDO at 7–8.

Q. [PROSECUTOR] Are you familiar, if you know, whether or not any procedures or there's any protocol to determine whether or not your balance is operating properly?

A. Yes, sir.

Q. Will you please briefly explain to the jurors what this process is.

A. *We have a manufacturer representative who checks out and service the balance two times a year, and I have my own personal balance* [13] *which I verify and validate once a month and we so record it.*

Q. Is there anything based on your experience with this balance, 30 years of experience, that could indicate to you whether or not the balance is not working properly?

A. No, I have not come across that even once.

(Emphases added.) This, the ICA concluded, "satisfies the third prong of the *Long*" test. SDO at 7; *Long,* 98 Hawai'i at 355, 48 P.3d at 602 (stating that the third prong was "whether the instrument is in proper working order"). Similarly, in its answering brief Respondent maintained that Mohammed "took the necessary steps ... to insure that his ... balance was in ... working order." As emphasized above, Respondent also alludes to the fact that Mohammed was an expert and his opinion had been "based on his field of expertise," he had worked on the

---

**13.** The reference to Mohammed's *"personal* balance" (emphasis added) creates confusion as to its involvement in the weighing of Respondent's Exhibits 2 through 7, and whether that particular balance was working properly. Defense counsel engaged Mohammed in the following series of questions, which indicates that the balance used to weigh Respondent's Exhibits 2 through 7 was a government owned instrument serviced by the manufacturer:

Q. [DEFENSE COUNSEL:] Mr. Mohammed, the analytical balance you mentioned is that an electronic instrument?

A. [MOHAMMED:] Yes, it is.

. . . .

Q. And you've never worked at calibrating these instruments?

A. No.

. . . .

Q. But, let me see, *you did testify that the manufacturer sends representatives to do the actual calibration; correct?*

A. *The actual servicing and the calibration two times a year.*

Q. Okay. *Now the analytical balance that you mentioned—*

A. Yes

Q. *—was it the same particular balance that you used to analyze the State's Exhibits 2 through 7, same analytical balance?*

A. *Yes, sir.* . . .

(Emphases added.)

balance for over 25–30 years, the balance was used in the regular course of business.[14]

Thus, as to the procedure or protocol to determine whether the balance was working properly, Mohammed first asserted that a service representative checked the balance twice a year. However, as mentioned before, Mohammed did not know how to calibrate or service the balance, no service representative testified as to his or her calibration of the balance, and no business record was introduced into evidence in lieu of such testimony.

As to Mohammed's assertion that the balance was in "proper working order," because he "verified and validat[ed it] once a month," Respondent failed to produce evidence of any manufacturer's established procedure for such validation and verification or of what such procedure involved. Mohammed's statement that he "in his experience" had "not come across" anything "that *could* indicate whether or not the balance is not working properly" in 30 years is ambiguous. It suggests that either there was nothing which would indicate whether the balance was working properly or not, or that there were indicia that would allow Mohammed to determine whether the balance was operating properly. The testimony thus begs the question of whether there was a manufacturer's established procedure for verifying that the balance was working properly and, if so, that Mohammed followed that particular procedure or, if there was no such procedure in place or designated by the balance's manufacturer, that the balance could be accepted as reliable based simply on the semi-annual manufacturer service inspections. There was no evidence to establish either was the case, leaving the testimony insufficient to establish the reliability of the balance.

By contrast, as mentioned before, Mohammed testified "a routine check" was done of the GCMS "each and every morning" "to ensure that all the parameters are within manufacturer specifications." Respondent submitted no evidence of a similar procedure to confirm that the balance was operating within the parameters of the manufacturer's specifications before the time of the weighing.[15] Thus, although the record indicates that Mohammed was trained to follow a certain procedure to ensure that the GCMSs were in working order, it fails to show that there was a manufacturer's accepted procedure for the user of the balance to implement to ensure the balance was in working order.

Therefore, Mohammed's assertion on cross-examination that "I do have personal knowledge because I would not have used any of the instruments if they were not in proper working condition in that particular days," [sic] is inconsistent with the "personal knowledge" necessary to establish that the balance was in proper working condition. Based on the foregoing analysis a proper foundation for the weight of the methamphetamine was not established.

## XII.

 Disregarding the erroneously admitted weight of the methamphetamine, the record is not legally sufficient to support Petitioner's convictions for the charges. As recounted in *Wallace,*

> HRS § 701–114(1)(a) and (b) (1993) requires proof beyond a reasonable doubt of each element of the offense, as well as the

---

14. Respondent's contentions bear on Mohammed's qualifications to identify and analyze the drugs and to opine on their nature and the procedure and instruments used, but do not establish facts with respect to the accuracy of the electronic balance itself.

15. Respondent itself elicited testimony that Mohammed did not test the balance to determine if it was working properly at the time of the weighing. When the prosecutor asked Mohammed, "Do you ever check the balance ... before each individual test that you perform during the normal course of business?" he responded, "No, sir." Mohammed implicitly indicated he did not because nothing in thirty years "could indicate" to him that the balance was working improperly. To reiterate the testimony:

> Q. Is there anything based on your experience with this balance, 30 years of experience, *that could indicate to you whether or not the balance is not working properly?*
> A. No, I have not come across that even once.

(Emphasis added.) In the absence of any other evidence of an accepted manufacturer's procedure, an appropriate inquiry would be whether the accuracy of the balance had been checked before the weighing of the evidence, as Respondent anticipated.

**358**

state of mind required to establish each element of the offense. Moreover, HRS § 702–204 (1993) provides in relevant part that "a person is not guilty of an offense unless the person acted intentionally, knowingly, recklessly, or negligently, as the law specifies with respect to each element of the offense." ... HRS § 702–207 (1993) provides that "[when] the definition of an offense specifies the state of mind sufficient for the commission of that offense, without distinguishing among the elements thereof, the specified state of mind shall apply to all elements of the offense, unless a contrary purpose plainly appears." In addition, pursuant to HRS § 702–205 (1993), the requisite state of mind applies to such conduct, attendant circumstances, and results of conduct as are specified by the definition of the offense.

80 Hawai‘i at 412, 910 P.2d at 725 (citations omitted).

A person commits the offense of Promoting a Dangerous Drug in the First Degree in violation of HRS § 712–1241(1)(b)(ii)(A), *inter alia*, if the person knowingly distributes "[o]ne or more preparations, compounds, mixtures, or substances of an aggregate weight of ... [o]ne eighth ounce or more, containing methamphetamine[.]" Thus, for this offense, the prosecution was required to prove beyond a reasonable doubt that Petitioner (1) distributed one or more substances containing methamphetamine (*i.e.*, the prohibited conduct); (2) the substances were of an aggregate weight of one-eighth ounce or more (*i.e.*, the attendant circumstance of requisite quantity); and (3) the he acted knowingly (i.e., the requisite state of mind with respect to both of the foregoing elements). *See Wallace*, 80 Hawai‘i at 412, 910 P.2d at 725.

A person commits the offense of Promoting a Dangerous Drug in the Second Degree in violation of HRS § 712–1242(1)(b)(i), *inter alia*, if the person knowingly "[p]ossesses one or more preparations, compounds, mixtures, or substances of an aggregate weight of ... *one-eighth ounce or more*, containing methamphetamine[.]" Thus, for this offense, the prosecution was required to prove beyond a

reasonable doubt that Petitioner (1) possessed one or more substances containing methamphetamine (*i.e.*, the prohibited conduct); (2) the substances were of an aggregate weight of one-eighth ounce or more (*i.e.*, the attendant circumstance of requisite quantity); and (3) he acted knowingly (*i.e.*, the requisite state of mind with respect to both of the foregoing elements). *See Wallace*, 80 Hawai‘i at 413, 910 P.2d at 726.

As to the first degree charge, the evidence established that Petitioner distributed one or more substances containing methamphetamine, and that he acted knowingly in distributing such substances. As to the second degree charge, the evidence established that Petitioner possessed one or more substances containing methamphetamine, and that he knowingly possessed such substances. However, disregarding Mohammed's testimony as to the weight of the substances, the record is devoid of any evidence of the requisite weight of the methamphetamine, a material element of the offenses charged. *See id.* Because those material elements of the offenses are not supported by substantial and admissible evidence, Respondent failed to adduce sufficient evidence to prove every element of the offenses beyond a reasonable doubt. *See id.* Therefore, Petitioner's convictions must be vacated. *See id.*

## XIII.

■ Having vacated Petitioner's convictions, "for evidentiary insufficiency, ... the double jeopardy clause of the fifth amendment to the United States Constitution bars a retrial of that offense." *Id.* at 414, 910 P.2d at 727 (citation omitted). "However, remanding the case for retrial on *lesser included offenses* offends neither the fifth amendment to the United States Constitution nor article I, section 10 of the Hawai‘i Constitution." *Id.* (citing *State v. Malufau*, 80 Hawai‘i 126, 136, 906 P.2d 612, 622 (1995)).

■ "For purposes of article I, section 10, a lesser included offense is an offense that is (1) 'included' in a charged offense, within the meaning of HRS § 701–109(4) (1993), and (2) 'of a class and grade lower than the greater [charged] offense,' as de-

scribed in HRS §§ 701–109(4)(a) and 701–109(4)(c)." *Id.* at 415, 910 P.2d at 728. Furthermore, "if an appellate court deems the evidence insufficient as a matter of law to support a jury's guilty verdict on a greater offense but finds the evidence sufficient to support a conviction on a lesser included offense, it may enter a judgment of conviction on that lesser included offense." *Id.* at 414–15, 910 P.2d at 727–28 (quoting *Malufau,* 80 Hawai'i at 135, 906 P.2d at 621).

■ As to Count 8, Promoting a Dangerous Drug in Second Degree, HRS § 712–1242(c) is included in the charged offense of Promoting a Dangerous Drug in the First Degree, HRS § 712–1241(1)(b)(ii)(A), inasmuch as "[i]t is established by proof of the same or less than all the facts required to establish the commission of the offense charged[,]" HRS § 701–109(4)(a), and because "it is impossible to commit the greater without also committing the lesser." *State v. Kinnane,* 79 Hawai'i 46, 51, 897 P.2d 973, 978 (1995) (citations omitted). The second degree offense being a class B felony, it is "of a class and grade lower than the greater [charged] offense," *Wallace,* 80 Hawai'i at 415, 910 P.2d at 728, a class A felony. Thus, Promoting a Dangerous Drug in the Second Degree, HRS § 712–1242(c) is a lesser included offense of the charged offense of Promoting a Dangerous Drug in the First Degree, HRS § 712–1241(1)(b)(ii)(A).

■ As recounted *supra,* the evidence establishes that Petitioner knowingly distributed methamphetamine. "A person commits the offense of promoting a dangerous drug in the second degree if the person knowingly ... [d]istributes any dangerous drug in any amount." HRS § 712–1242(1)(c). Thus, on remand of Count 8, the court shall enter judgment convicting Petitioner of Promoting a Dangerous Drug in the Second Degree as defined by HRS § 712–1242(1)(c).

■ As to Count 9, Promoting a Dangerous Drug in the Third Degree, HRS § 712–1243(1) (1993 & Supp.2003), is included in the charged offense of Promoting a Dangerous Drug in the Second Degree, HRS § 712–1242(1)(b)(i), inasmuch as "[i]t is established by proof of the same or less than all the facts

required to establish the commission of the offense charged[,]" HRS § 701–109(4)(a), and because "it is impossible to commit the greater without also committing the lesser." *Kinnane,* 79 Hawai'i at 51, 897 P.2d at 978 (citations omitted). The third degree offense being a class C felony, it is "of a class and grade lower than the greater [charged] offense," a class B felony. Thus, Promoting a Dangerous Drug in the Third Degree, HRS § 712–1243(1), is a lesser included offense of the charged offense of Promoting a Dangerous Drug in the Second Degree, HRS § 712–1242(1)(b)(i).

■ As recounted *supra,* the evidence establishes that Petitioner knowingly possessed methamphetamine. "A person commits the offense of promoting a dangerous drug in the third degree if the person knowingly possesses any dangerous drug in any amount." HRS § 712–1243(1). Thus, on remand of Count 9, the court shall enter judgment convicting Petitioner of Promoting a Dangerous Drug in the Third Degree, HRS § 712–1243(1). Accordingly, the case is remanded for resentencing as the court may, in its discretion, determine appropriate.

Concurring Opinion by LEVINSON, J., with whom MOON, C.J., joins.

I agree with the majority that *State v. Wallace,* 80 Hawai'i 382, 910 P.2d 695 (1996), governs the outcome of this appeal and that, applying *Wallace:* (1) the prosecution laid "a proper foundation for the *identity* of the crystalline substances," namely, methamphetamine, and the circuit court therefore "did not abuse its discretion in allowing Mohammed to testify as to the identity of the crystalline substances" (emphasis added); and (2) "a proper foundation for the *weight* of the methamphetamine was not established" (emphasis added), and the circuit court therefore erred in allowing Mohammed's testimony on that subject. Majority opinion at 354, 357, 167 P.3d at 347, 350. Accordingly, I also agree that the Intermediate Court of Appeals (ICA) erred in affirming Manewa's convictions of promoting a dangerous drug in the first and second degrees, that the convictions should be vacated, and that the matter should be remanded to the circuit court with

instructions to enter a judgment convicting Manewa of the included offenses of promoting a dangerous drug in the second and third degrees, respectively, and sentencing him pursuant thereto. Majority opinion at 358–59, 167 P.3d at 351–52.

Like the majority, I believe that *State v. Schofill*, 63 Haw. 77, 621 P.2d 364 (1980), is inapposite to the matter before us, but not for the reasons that the majority gives. *See* majority opinion at 352–53, 167 P.3d at 345–46. Rather, I believe that *Schofill* is susceptible to misinterpretation and is in need of further analysis.

It appears that "Tiny" Schofill was a Maui drug dealer who was importuned by a Maui Police Department undercover officer to sell him a quarter ounce of cocaine. Tiny agreed to do so, through an intermediary, in return for $550.00, which the officer paid. After several fits and starts, the intermediary produced four clear plastic packets of white powder, which he acknowledged weighed less than the requested quarter ounce but which he offered to the officer as a first delivery, the remainder to follow. The officer said no dice, asked for his money back, and apparently received it. Thus, as the *Schofill* court put it, "[n]o actual purchase was ever consummated with the defendant." *See Schofill*, 63 Haw. at 78–80, 621 P.2d at 366–67.

A Maui grand jury later returned an indictment against Tiny, charging him with promoting a dangerous drug in the first degree, in violation of HRS § 712–1241(1)(b), identical in all material respects to the current incarnation. *Id.* at 78, 621 P.2d at 366. Tiny moved to dismiss the indictment. The undercover officer, the prosecution's only witness at the hearing on Tiny's motion, testified that, having run around the track a time or two in the performance of his duties, the white powder surely did appear to him to be cocaine. *Id.* at 80, 621 P.2d at 367–68. A skeptical circuit court wondered how in the world the prosecution was going to prove at trial that the white stuff was in fact cocaine (as opposed, say, to confectioner's sugar or dandruff) and dismissed the indictment on

the ground, *inter alia*, that it was unsupported by competent evidence. *Id.* at 78, 80, 621 P.2d at 366, 368.

On appeal, this court reversed the circuit court's order dismissing the indictment and remanded the matter for trial, based upon the following reasoning, which bears close scrutiny:

> Where possession of narcotics is the gist of the offense charged, the government must establish beyond a reasonable doubt that the substance involved is that specified in the indictment. *The same rule obtains where the sale has been consummated.* [Tiny], however was indicted for knowingly distributing proscribed drugs under HRS § 712–1241 . . . .

> A person "distributes" a dangerous drug when he sells, transfers, gives, or delivers to another, or leaves, barters, or exchanges with another, *or offers or agrees to do the same.* Thus, the crime of promoting a dangerous drug by distributing the same is complete where, with the specific intent to sell, the accused has offered to sell the contraband. Thus, the trial court erred when it presumed that the white, powdery substance which the defendant offered to sell through his intermediary must have been shown beyond a reasonable doubt to be cocaine before a conviction could be obtained.

> . . . .

> The essential question before the grand jury was whether [Tiny] intended to sell the proscribed drug to the undercover police officer. Considering the history of the negotiations between the officer and [Tiny] or his intermediary, the representation that the narcotic offered to be sold was cocaine, and the officer's familiarity with the substance, we find that there was ample evidence presented to the grand jury from which a trial jury could have found [Tiny] guilty of *offering to sell* narcotics beyond a reasonable doubt.[1] The challenged testimony was neither incompetent nor prejudicial, and the trial court ought

---

1. I note that, problematically, the foregoing reasoning renders the form of promoting a dangerous drug at issue in *Schofill* virtually indis-

tinguishable from the offense of *attempted* promoting a dangerous drug. *See* HRS § 705–500 (1993).

not to have dismissed the indictment on that particular ground.

*Id.* at 80–81, 83–84, 621 P.2d at 368, 370 (citations omitted) (some emphasis added and some in original).

I would limit *Schofill's* ongoing vitality to instances of "promoting" a controlled substance by way of "distribution," under circumstances in which a sale has been cut short, such that the prosecution's proof is limited to a defendant's "offering to sell" a controlled substance, accompanied, of course, by the requisite state of mind. By its own analysis, *Schofill* is inapplicable to instances, such as the matter before us, in which "the sale has been consummated" and "the government must establish beyond a reasonable doubt that the substance involved is that specified in the indictment." *Id.* at 80, 621 P.2d at 368. It is for that reason that *Schofill* is inapposite to and distinguishable from the matter at hand.