**NOT FOR PUBLICATION IN WEST'S HAWAIʻI REPORTS AND PACIFIC REPORTER**

**Electronically Filed
Intermediate Court of Appeals
CAAP-19-0000878
29-JUL-2022
07:57 AM
Dkt. 51 SO**

NO. CAAP-19-0000878

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI

STATE OF HAWAIʻI, Plaintiff-Appellant,
v.
ERIC SCOTT, Defendant-Appellee

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(1CPC-18-0000387)

### SUMMARY DISPOSITION ORDER
(By: Leonard, Presiding Judge, Hiraoka and Wadsworth, JJ.)

Plaintiff-Appellant **State** of Hawaiʻi appeals from the:
**(1)** "Order Excluding Evidence of Test Result at Trial Pursuant to
Hawaii Rules of Evidence (H.R.E.) Rules 104 and 702" entered by
the Circuit Court of the First Circuit on December 17, 2019
(**Exclusion Order**); and **(2)** "Order Granting Defendant's Oral
Motion to Dismiss and Dismissing this Case with Prejudice"
entered by the circuit court on December 6, 2019 (**Dismissal
Order**).[1]  For the reasons explained below, we affirm the
Exclusion Order and the Dismissal Order.

Defendant-Appellee Eric **Scott** was charged by felony
information with two counts of Promoting a Dangerous Drug in the
Third Degree in violation of Hawaii Revised Statutes (**HRS**) § 712-
1243.  Count 1 alleged that Scott possessed methamphetamine;

---

[1]     The Honorable Karen T. Nakasone presided.

Count 2 alleged that Scott possessed heroin.  Scott pleaded not guilty.  The State moved to nolle prosequi Count 1.  The circuit court granted the motion and dismissed Count 1 with prejudice. Only Count 2 remained.

The circuit court conducted a Hawaii Rules of Evidence (**HRE**) Rule 104 hearing on November 20 and 22, 2019.[2]  At issue was whether a test result (allegedly showing that the substance recovered from Scott's van was heroin) would be admissible at trial.  The circuit court orally ruled that the test result was not admissible.  Scott then orally moved to dismiss the remaining count.  The circuit court orally granted the motion and dismissed Count 2 with prejudice.  The Exclusion Order and the Dismissal Order were subsequently entered.  This appeal followed.

The State contends that the circuit court erred by:
**(1)** excluding the State's expert's opinion that an unknown substance was heroin based on insufficient foundation;
**(2)** refusing to admit State's Exhibit 18 into evidence; and
**(3)** dismissing the case against Scott.

**(1)**  "A fundamental evidentiary rule is that before the result of a test made out of the court may be introduced into evidence, a foundation must be laid showing that the test result can be relied on as a substantive fact."  State v. Subia, 139 Hawaiʻi 62, 66, 383 P.3d 1200, 1204 (2016) (cleaned up).  "A proper foundation for introducing a test result . . . include[s] expert testimony regarding: (1) the qualifications of the expert; (2) whether the expert employed valid techniques to obtain the test result; and (3) whether the measuring instrument is in proper working order."  Id. (cleaned up).  The determination of whether proper foundation has been established for the admission

---

[2]     HRE Rule 104 provides, in relevant part:

(a)   Questions of admissibility generally. Preliminary questions concerning the qualification of a person to be a witness . . . or the admissibility of evidence shall be determined by the court[.]

of evidence lies within the discretion of the trial court; we review for abuse of discretion. <u>Id.</u>

The State called Honolulu Police Department (**HPD**) criminalist Dawn **Nakamura** as a witness for the HRE Rule 104 hearing. The circuit court qualified Nakamura as an expert in "forensic science with subspecialty in drug analysis and identification."

Nakamura testified that she tested a black, tar-like substance collected as evidence in Scott's case to determine whether it contained heroin. She performed two tests on the evidence: a presumptive color test using a chemical, and a confirmatory test using a gas chromatograph mass spectrometer (**GCMS**). The color test indicated the evidence possibly contained heroin.

Nakamura then ran a confirmatory test using the GCMS. She explained that the GCMS "is a two-part instrument." The gas chromatograph separates the components of the substance being tested. The mass spectrometer then breaks up each component into a unique, reproducible fragmentation pattern. A sample of a known drug (called a **"positive control"**) is then run through the GCMS. The positive control "is a known drug that [HPD] purchase[s] through a reputable company that we can then use to review that data against the unknown." If the fragmentation pattern of the evidence being tested matches that of the positive control, the evidence is identified. The confirmatory test showed that the evidence in Scott's case contained heroin.

On cross-examination, Nakamura testified:

> Q. I guess what I'm talking about is the actual reference standard that you're comparing the unknown to. How do you know that the reference sample is actually a true reflection of heroin and not some other contaminant that's been introduced into the GC/MS device?
>
> A. I see. So we purchase the -- in this case, a heroin standard from a reputable company. It comes with a certificate of analysis on what the item is, but we still in the laboratory do not take for granted that that is what we were shipped. Therefore, prior to even using it on a casework, we will run the standard, which is supposed to be heroin, either on a GC/MS or on another instrument, and then

we will look at that spectrum that we receive and compare that to a reputable published reference. And if it has -- if the spectrum is the same and we can -- it passes all of the criteria set forth in the laboratory, we can then say that we did, in fact, receive a heroin standard. And at that point, it has been verified and fit for use in our laboratory.

Q. And in this particular analysis, do you know who prepared the working reference standard?

A. Not off of the top of my head but we do have records in our laboratory to track who had made that standard.

Q. And you're assuming that the standard was tested correctly according to whatever procedures are in place to give you a correct reading that the reference sample is actually heroin and not some other contaminant?

A. Yes, we have all of the paperwork in our laboratory to verify that those checks had been done.

Q. You personally haven't verified it on the machine?

A. I may have. I -- I -- I may have been the one that actually made the standard in this case, but I am not sure. Again, I would have to reference back.

Q. And you can't tell me when this working standard was created?

A. Again, that is all in our paperwork, and I would be able to reference -- reference the paperwork and let you know.

The State did not introduce the HPD drug analysis laboratory records or "paperwork" establishing that the positive control used to test the evidence in Scott's case was in fact heroin. During closing argument the circuit court questioned whether the positive control had been proven to be heroin:

THE COURT: The known heroin stamp, where is the accuracy on that being a standard?

[DEPUTY PROSECUTOR]: Your Honor, it's the State's position that that is not a foundational requirement required by case law.

Case law requires that we show for foundation that the instrument was in proper working order, not that the standard used is actually heroin.

That is a determination on -- after cross-examination in front of a jury to determine whether or not they believe that the heroin standard is, in fact, heroin. It's a weight issue, not an admissibility issue.

4

Defense counsel argued:

Where do they get this heroin?  They get it from certified labs, and I'm pretty sure you got to go through a lot of paperwork if you want to get -- buy heroin, you know, from a lab.

They're going to send you a certificate -- you know, a certificate that says, Analysis, this is heroin, and then there would be a paper trail in terms of that going to the lab, and the lab doing their own verification to ensure that their method is the correct method in terms of determining that this is heroin, yet we don't know if that was done, or when it was done, or who did it, or if it was done correctly.

How do we even know that the sample that they're comparing it to is even heroin?  We don't.

The circuit court asked:

THE COURT:  Okay.  I have one more question to you, to either counsel.

Is there HPD SOP on the procedure, any certification procedure regarding how they go about obtaining the known samples?

[DEFENSE COUNSEL]: Yes, there is.

THE COURT:  Did that come out in evidence?

[DEFENSE COUNSEL]: It --

THE COURT:  It did not.

[DEFENSE COUNSEL]: It did not.

THE COURT:  But it exists?

[DEFENSE COUNSEL]: It exists, specifically, in their operating manual, um, and their quality manual discusses the procedures in terms of paper trail and making sure that the proper certificates are on file to ensure that it is.

THE COURT:  Okay.  If it didn't come out in evidence I won't ask anymore about it.

[DEPUTY PROSECUTOR]: I believe that Ms. Nakamura testified that the heroin is acquired from a reputable company, and then tested on its own in HPD, but I believe that's the extent of the evidence --

THE COURT:  Okay.

[DEPUTY PROSECUTOR]: -- as for the heroin standard.

[DEFENSE COUNSEL]:  And that's, I mean, that's kind of one of the reasons why I didn't go into it.  I didn't think they'd established a foundation to even kind of raise the

issue.  She doesn't know where it came from or who tested it.

THE COURT:  Okay.

[DEPUTY PROSECUTOR]: May I respond to that.

THE COURT:  Yeah, you can.

.  .  .  .

[DEPUTY PROSECUTOR]: So the questions about whether or not the known -- the heroin standard is actually heroin or not, State submits that that is a determination for the jury, we just need to show that the data that's printed out from the instrument is reliable, and it is.

The Exclusion Order contained a finding of fact which provided, in relevant part:

> 8.    The first tier of the "positive and negative controls" was not established, as there was no foundation that the "known" drug sample purported to be heroin, purchased by the Crime Lab, was, in fact, heroin.

This negative finding was supported by the lack of substantial evidence, and was not clearly erroneous.  Nakamura did not remember whether she personally verified that the positive control was in fact heroin, and the HPD records and paperwork to which she would refer were never introduced into evidence.

The Exclusion Order contained the following conclusion of law:

> 4.    In the instant case, the unknown sample in this case was tested against a known "heroin" drug sample, yet there was no foundation laid that the known sample was in fact heroin . . . .  The record must contain accurate and reliable evidence that the known sample used in this case to test the unknown substance, was heroin.

This conclusion was not wrong.  See State v. Wallace, 80 Hawai'i 382, 407, 910 P.2d 695, 720 (1996) ("The reliability of expert testimony supplying scientific evidence depends upon the proper application of valid techniques grounded in valid underlying principles.  It is axiomatic that such reliability is not possible in the absence of a **sound factual foundation**.") (cleaned up) (emphasis added).  The circuit court did not abuse its discretion by ruling that the State failed to lay a proper

foundation for admission of the GCMS test result to prove that the evidence obtained from Scott's van contained heroin.

**(2)** Because we conclude that the circuit court did not err by excluding the GCMS test result, we need not decide whether the circuit court erred by refusing to admit State's Exhibit 18 (the GCMS preventive maintenance check signed by Dorian Taylor) into evidence.

**(3)** The State's only argument in support of its contention that the circuit court erred by dismissing the case against Scott is that the circuit court "erred when it excluded Nakamura's expert opinion that the unknown substance was heroin[.]" The State conceded that it could not proceed to trial without the GCMS test result. Because we conclude that the circuit court did not err by excluding the GCMS test result, we also conclude that the circuit court did not err by granting Scott's motion to dismiss.[3]

For the foregoing reasons, the circuit court's December 17, 2019 Exclusion Order and December 6, 2019 Dismissal Order are affirmed.

DATED: Honolulu, Hawaiʻi, July 29, 2022.

On the briefs:

Chad M. Kumagai,
Deputy Prosecuting Attorney,
City and County of Honolulu,
for Plaintiff-Appellant.

William H. Jameson, Jr.,
Deputy Public Defender,
State of Hawaiʻi,
for Defendant-Appellee.

/s/ Katherine G. Leonard
Presiding Judge

/s/ Keith K. Hiraoka
Associate Judge

/s/ Clyde J. Wadsworth
Associate Judge

---

[3] The State does not argue that the dismissal should have been without prejudice. We note that the circuit court addressed the factors adopted in State v. Estencion, 63 Haw. 264, 269, 625 P.2d 1040, 1044 (1981), before dismissing the case with prejudice.